# EXHIBIT A



401 City Avenue
Bala Cynwyd, PA 19004

# EMPLOYMENT AGREEMENT BETWEEN

## SUSQUEHANNA INTERNATIONAL GROUP, LLP

### AND

### LUIS J. COTA

This Agreement is entered into on this __24__ day of September, 2016 by and between Susquehanna International Group, LLP, a limited liability partnership formed and registered under the laws of Delaware with a principal place of business at 401 City Avenue, Bala Cynwyd, Pennsylvania 19004 (together with its related and/or affiliated entities, "SIG"), and Luis J. Cota ("Employee"), an individual residing at 201 Montgomery Street, Apartment 541, Jersey City, New Jersey 07302.

WHEREAS, SIG is engaged in, among other businesses, the active trading of securities and other financial products and the provision of institutional brokerage services;

WHEREAS, Employee wishes to be employed by SIG in connection with the trading of securities and/or other financial products and the provision of institutional brokerage services; and

WHEREAS, SIG desires to educate, train and employ Employee, and Employee desires to be educated, trained and employed by SIG on the terms and conditions set forth in this Agreement.

WHEREFORE, the parties hereto, intending to be legally bound hereby, do agree as follows:

1. Employment. SIG agrees to employ Employee, and Employee agrees to be employed by SIG, on the terms and conditions set forth in this Agreement effective from __September 24__, 2016 (the "Effective Date") until December 31, 2017 (the "Term"); provided you transfer to SIG's Bala Cynwyd office no later than ninety (90) days after the Effective Date. While employed by SIG, Employee will devote his/her entire working time, energy, skill and best efforts to further the business interests of SIG. For the avoidance of doubt, while employed by SIG, Employee may be required to carry out work on behalf of and as an employee of Susquehanna International Group, LLP and/or one or more of its related and/or affiliated entities on a temporary or permanent basis.

2. Exclusivity. While employed by SIG, Employee will not perform any employment or contractual activities/services except for the account of SIG without the prior written consent of SIG.

3. Representations and Warranties. Except for SIG and as set forth on Exhibit A hereto, Employee represents and warrants that as of the Effective Date and the date of this Agreement (i) he/she has all licenses necessary or desirable to provide the services contemplated herein, (ii) he/she is not and will not be under a contract, written or oral, to provide services to any entity or person, (iii) he/she is not and will not be subject to any restriction regarding the solicitation or hiring of employees or the solicitation of business from or the performance of services for any individuals or entities, (iv) neither the execution, delivery nor performance of this Agreement constitutes a breach of any other contract of which Employee is subject, and (v) he/she has not received any subpoena from, and is not the subject of any current, pending or threatened complaint, proceeding or investigation filed, initiated or conducted by, any judicial, governmental, administrative or self-regulatory body or by any of his/her former employers. Employee will defend and hold SIG and its officers, directors, employees and agents harmless from any and all claims, costs and expenses suffered or incurred by SIG, including attorneys' fees, as a result of, or in connection with, a breach of any representation contained in this paragraph.

4. <u>Regulation</u>. While employed by SIG, Employee shall maintain all required licenses and registrations and comply with all applicable laws, regulations, exchange requirements and SIG policies, procedures and guidelines. In this regard, Employee shall not trade for his/her own account except in compliance with SIG policy, nor for the account of any other person or entity, nor shall he/she provide trading advice to any other person, at any time he/she is employed by SIG. While Employee is employed by SIG, SIG will be responsible for the costs associated with maintaining all such required licenses and registrations.

5. <u>Compensation</u>. Employee shall receive compensation while employed by, and providing services to, SIG under this Agreement as follows:

(a) Employee shall receive a salary at a gross monthly rate of $ ▓▓▓▓▓ commencing on the Effective Date.

(b) Employee shall be eligible to be awarded a fixed bonus in the gross amount of $40,000.00 for the calendar year ending December 31, 2016. Moreover, although the fixed bonus amount is based on a full calendar year, except as otherwise provided in this Agreement, the bonus amount that Employee shall be eligible to be awarded with respect to the calendar year ending December 31, 2016 will not be prorated to take into account that Employee was not employed for the full calendar year, so long as Employee commences employment hereunder on or before October 17, 2016. In the event that Employee commences employment hereunder after October 17, 2016, the bonus amount that Employee shall be eligible to be awarded with respect to the calendar year ending December 31, 2016 will be multiplied by a fraction, the numerator of which is the number of days from the date on which Employee commences employment hereunder until December 31, 2016 and the denominator of which is 366.

(c) Employee shall be eligible to be awarded a discretionary bonus for the calendar year ending December 31, 2017. SIG expects that this discretionary bonus will be determined at an annual rate between $40,000.00 and $80,000.00, with a target discretionary bonus determined at an annual rate of $60,000.00. As described in Paragraph 5(g) below, the bonus amount that Employee shall be eligible to be awarded under this Paragraph 5(c) is discretionary.

(d) Employee also shall be eligible to be awarded a discretionary bonus for each calendar year after 2017 that Employee is employed hereunder. As described in Paragraph 5(g) below, the bonus amounts that Employee shall be eligible to be awarded under this Paragraph 5(d) are discretionary.

(e) In addition to the compensation discussed above, SIG will pay Employee's reasonable relocation expenses to the Philadelphia area, including the packing, shipping, storage (up to one (1) month) and unpacking of Employee's household goods by SIG's corporate relocation provider. SIG will also provide Employee with up to one (1) month of temporary corporate housing. In the event Employee resigns, is terminated by SIG for Cause (as defined below) or breaches any of Employee's obligations to SIG hereunder, in each case, within one (1) year after Employee transfers to SIG's Bala Cynwyd office, Employee shall immediately reimburse SIG in accordance with the Relocation Financial Assistance Agreement executed by Employee in connection herewith.

(f) No salary or bonus will be paid under Paragraphs 5(a), 5(b), or 5(c) in the event Employee resigns or is terminated for Cause prior to the award and payment of such salary or bonus by SIG. No bonuses will be paid under Paragraph 5(d) in the event Employee's employment terminates for any reason prior to the award and payment of such bonus by SIG. All compensation (including bonuses) shall be paid in accordance with SIG's normal payroll policies as in effect from time to time and shall be net of any applicable withholding requirements. The bonus for each year will not be earned or payable until the Management Committee of SIG, in its complete discretion, determines that the performance of SIG for such year and through the payment date is sufficient to declare and pay such bonus. Employee acknowledges and assumes the risk that an event could occur before the date SIG typically would declare and schedule to pay bonuses that prevents SIG from declaring

and paying those bonuses. If SIG's Management Committee elects not to award Employee a bonus because it makes the determination that SIG's performance is insufficient to declare and pay such bonus, regardless of whether Employee is employed by SIG, Employee shall remain eligible to be awarded the bonus as set forth herein until, if ever, SIG's Management Committee determines SIG's performance is sufficient to declare and pay such bonus, which determination, declaration and payment shall be prior to any award and payment of employee bonuses with respect to any subsequent year. Any determination by SIG's Management Committee not to award bonuses, in whole or in part, based on a determination that SIG's performance is insufficient to declare and pay such bonuses shall be made consistently for all employees with either discretionary bonuses or bonuses that contain conditions similar to those contained in this Agreement. The bonus that may be awarded in respect of a calendar year shall be prorated if Employee is on a leave of absence from SIG (because of disability or otherwise) during such calendar year.

(g) The discretionary bonuses that Employee is eligible to be awarded hereunder, and the term "target discretionary bonus" as used herein, refer only to those bonuses which may be awarded by SIG in its sole discretion. When determining whether to award such bonuses and the amount of such bonuses, SIG may consider factors as it deems relevant, such as by way of example only, the overall performance of SIG, and whether Employee's performance (as determined by SIG in its sole discretion) meets the standard of performance required by SIG. Employee understands that the bonus amounts that Employee is eligible to be awarded pursuant to Paragraphs 5(c) and 5(d) are entirely within the discretion of SIG and SIG retains the absolute, unfettered discretion to grant no bonus whatsoever.

(h) Employee agrees and acknowledges that SIG may set off any amounts that he/she may now or hereafter owe to SIG against any amounts that may be awarded by SIG to him/her under this Agreement or otherwise.

6. Termination.

(a) During the Term, SIG may terminate Employee's employment for Cause by providing Employee notice of the effective date of such termination (which effective date may be immediately). For purposes of this Agreement, "Cause" means either (i) that Employee commits (or has committed) a regulatory or criminal violation, or becomes the subject of an investigation by any governmental, administrative or self-regulatory body or by any of Employee's former employers, in either event, stemming from conduct alleged to have been committed by Employee while acting in his/her capacity as a registered representative or otherwise in connection with the trading of securities or other financial products or with the financial services industry, whether before or during Employee's employment by SIG, that in SIG's sole discretion could be damaging to SIG's or Employee's business reputation or (ii) a determination by SIG that Employee failed to act in good faith, in furtherance of the business interests of SIG or in accordance with the terms set forth in this Agreement or the standards of conduct and performance adopted by SIG generally for its employees, including by way of example only, any of the following: (1) a willful failure by Employee to perform his/her duties hereunder (including neglect of such duties); (2) conduct by Employee that is materially injurious to SIG, monetarily or otherwise, (3) a breach by Employee of any of his/her material obligations under this Agreement; (4) Employee engaging in any criminal activity or other activity involving moral turpitude; or (5) any conduct by Employee involving significant undisclosed conflict of interest, serious impropriety, breach of corporate duty or misappropriation of any money or other assets or properties of SIG or any other party with which SIG does business.

(b) In the event Employee resigns or is terminated for Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except that: (i) after the termination date, the provisions of the last sentence of Paragraph 3, and the provisions of Paragraphs 5(e), 5(h) and 6 through 21 shall remain in full force and effect; (ii) SIG shall pay Employee, in accordance with SIG's normal payroll practices, all accrued but unpaid salary

through such termination date; and (iii) Employee shall, if applicable, immediately repay SIG the gross amount of the relocation expenses pursuant to Paragraph 5(e).

(c) In the event that on or before December 31, 2017, SIG terminates Employee without Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except that: (i) after the termination date the provisions of the last sentence of Paragraph 3, and the provisions of Paragraphs 5(f), 5(h), 6 and 7(b) through 21 shall remain in full force and effect; (ii) SIG shall pay Employee in accordance with SIG's normal payroll practices his/her salary pursuant to Paragraph 5(a) until the earlier of the end of the Term and the occurrence of an Early Termination Event (as defined below); and (iii) so long as an Early Termination Event has not occurred prior to the end of the applicable calendar year, Employee shall remain eligible to be awarded the unpaid fixed bonus pursuant to Paragraph 5(b). Any payments under clause (iii) of the immediately preceding sentence shall be made on the date that SIG generally pays bonuses to its employees for the applicable calendar year. An Early Termination Event shall occur if Employee, directly or indirectly, in any manner or capacity, engages in any activity reasonably similar to activities that Employee performed for SIG. Employee shall have an affirmative obligation to inform SIG in advance of the occurrence of an Early Termination Event prior to the end of the Term.

(d) Notwithstanding anything herein to the contrary, after the Term, either Employee or SIG may terminate Employee's employment for any or no reason at all by providing the other notice of the effective date of such termination (which effective date may be immediately), in which event neither SIG nor Employee shall have further obligations or liabilities hereunder, except that after the termination date, the provisions of the last sentence of Paragraph 3, and the provisions of Paragraphs 5(h), 6 and 7(b) through 21 shall remain in full force and effect. In this regard, Employee shall not be eligible to be awarded a discretionary bonus for any calendar year after the Term if he/she is not employed by SIG at the time such bonus is awarded and paid.

7. Restrictive Covenants. Employee hereby covenants to SIG as follows:

(a) In addition to other valuable consideration received by Employee (including the relocation expenses pursuant to Paragraph 5(e)), Employee acknowledges and recognizes the highly competitive nature of SIG's business and the investment made by SIG in the education and training of Employee and that as an Employee of SIG he/she shall have access to SIG trade secrets (as defined in the Uniform Trade Secrets Act) and other Confidential Information (as defined below). Employee further acknowledges that as a result of the education, training and employment that he/she shall receive from SIG pursuant to this Agreement, Employee may receive offers of employment by others engaging in or wishing to engage in any trading activity or activities reasonably similar to activities performed by Employee for SIG at equivalent or greater compensation than that offered by SIG. Employee accordingly agrees, in order to protect the legitimate business interests of SIG (including SIG's goodwill, education and training, trade secrets and other Confidential Information), that while employed by SIG and through December 31, 2017 (if later) (except when acting on behalf of SIG), Employee shall not, without the written consent of a member of the Management Committee of SIG, directly or indirectly, in any manner or capacity (as a stockholder, sole proprietor, officer, director, employee, partner, agent, consultant or in any other corporate or representative capacity), engage in or financially support any activity (a) involving or related to or supporting the trading (or brokering) of securities, commodities or any other financial products or (b) which is the same as, reasonably similar to or competitive with the activities that Employee either performed for SIG or gained knowledge of while at SIG.

(b) Employee further agrees that so long as he/she is employed or seconded by SIG and for a period of five (5) years after termination of his/her employment or secondment (except when acting on behalf of and for the benefit of SIG), he/she shall not directly or indirectly in any manner or capacity:

    (1) induce any persons who are employees or consultants of SIG, or persons seconded from SIG, to discontinue his/her employment or relationship with SIG; or

    (2) hire, solicit for employment, or in any other manner be directly or indirectly involved with the hiring or solicitation of, any SIG Person (as defined below), including by way of example only, (a) making any offer or otherwise attempting to hire (on his/her own behalf or on behalf of another) a SIG Person, (b) communicating with a SIG Person regarding the likelihood or possibility of hiring that SIG Person either currently or at a later date, (c) recommending that any other person or entity hire a SIG Person, or (d) directly or indirectly providing any information for use in connection with the possible hiring of a SIG Person;

provided that nothing herein shall prohibit Employee from responding to a prospective employer's request for an employment reference for a SIG Person who is no longer employed, seconded or engaged by SIG so long as Employee does not receive any direct or indirect economic benefit from the hiring or continued employment of such SIG Person.

  (c) Employee further agrees that so long as he/she is employed or seconded by SIG and for a period of nine (9) months after termination of his/her employment or secondment (except when acting on behalf of and for the benefit of SIG), he/she shall not directly or indirectly in any manner or capacity:

    (1) become employed by, or otherwise provide services or intellectual property to, any Restricted Entity (as defined below);

    (2) provide services as an employee or a consultant to any unit or division of a Competing Business (as defined below) if such unit or division is employing a SIG Person at the time Employee begins providing such services;

    (3) become partners of or co-owners in any Competing Business or otherwise share in five percent (5%) or more of the profits of any Competing Business (or any portion thereof), with any person that was a SIG Person within the previous five (5) years; or

    (4) provide to or accept from any Restricted Entity or any person that was a SIG Person within the previous five (5) years any investment or financial support, where such investment or financial support is used, directly or indirectly, by or for a Competing Business.

  (d) While employed by SIG and thereafter, Employee shall not take any action that improperly interferes with the business of SIG, such as, by way of example only: (a) interfering with any ongoing business relationship between SIG and any other person or entity; (b) interfering in any way with any joint venture or similar relationship between SIG and any other person or entity; or (c) interfering with SIG's ability to receive funds from any person or entity that provides or contemplates providing funds to SIG. Competing against SIG, by itself, will not constitute an interference with the business of SIG, provided that such competition is not otherwise in violation of this Agreement.

  (e) As used in this Agreement:

    (1) "<u>SIG Person</u>" means any person who is, or was within nine (9) months prior to the conduct prohibited by this Agreement, an employee of SIG, a consultant of SIG or a person seconded from SIG (other than nonprofessional employees whose annual rate of compensation (as most recently determined by SIG, including expected bonuses) is less than $100,000 **and** who neither are engaged in SIG's trading or brokerage activities nor directly work with or support SIG's trading personnel). All SIG personnel located or regularly working on SIG's upstairs trading floors,

trading systems or on an exchange floor are deemed to be directly working with or supporting SIG's trading personnel.

(2) "Competing Business" means any entity (or group of affiliated entities) that is in the business of engaging in securities or commodities transactions (including, without limitation, transactions in securities and commodities derivatives) for itself or for the account of others, any business in which SIG is then engaged or pursuing, or any business that provides intellectual property or services principally to any business in which SIG is then engaged or pursuing.

(3) "Restricted Entity" means a Competing Business where either it or the entity that controls (through ownership or otherwise) or manages it has (x) twenty-five percent (25%) or more of its Non-Clerical Employees being persons who were at any time employed or seconded by SIG, with at least one of such individuals having been a SIG Person within the previous five (5) years, (y) three (3) or more of its Non-Clerical Employees and ten percent (10%) or more of such entity's Non-Clerical Employees being persons who were at any time employed or seconded by SIG, with at least one of such individuals having been a SIG Person within the previous five (5) years, or (z) five (5) or more of its Non-Clerical Employees and one percent (1%) or more of such entity's Non-Clerical Employees being persons who were at any time employed or seconded by SIG, with at least one of such individuals having been a SIG Person within the previous five (5) years.

(4) "Non-Clerical Employee" means any person that is an employee of the Restricted Entity (other than nonprofessional employees whose annual rate of compensation is less than $100,000 **and** who either are not engaged in the Restricted Entity's trading or brokerage activities or do not directly work with or support the Restricted Entity's trading personnel).

8. Acknowledgment. Employee understands that the provisions of Paragraph 7 hereof may limit his/her ability to earn a livelihood in a business similar to the business of SIG, but nevertheless believes that he/she shall receive remuneration and other benefits hereunder, including training and education and access to Confidential Information, sufficient to justify the restrictions contained in such provisions. Further, Employee, given his/her education, skills and abilities, does not believe these restrictions would prevent him/her from earning a living. Employee also acknowledges that the business of SIG is international in scope and that the restrictions set forth in this Agreement are accordingly reasonable in geographic breadth even though not limited to any particular area or market.

9. Recognition. Employee recognizes that SIG would not employ Employee if Employee were not willing to agree to Paragraph 7. Moreover, Employee acknowledges that in his/her position as an employee of SIG, Employee has (and will continue to have) access to SIG Confidential Information and trade secrets, including, without limitation, SIG's trading strategies and methodologies, the levels of profitability of SIG's various trading activities and SIG's trading systems and tools and that Employee's access to SIG Confidential Information and trade secrets is likely to occur whether Employee remains in his/her current position or if Employee is transferred to a different business unit or trading area. Accordingly, the restrictions set forth in Paragraph 7 remain applicable and necessary whether or not Employee remains in his/her current position or is transferred to a different business unit or trading area.

10. Time. The length of time described in Paragraphs 7(a) (at least through December 31, 2017), 7(b) (five years) and 7(c) (nine months) shall not run during any period that Employee is in violation of any of the terms of Paragraph 7 and shall be extended for the period of any such violation.

11. <u>Non-Disclosure</u>. Both SIG and Employee acknowledge that, in order to permit the Employee to successfully perform and/or continue to perform the duties associated with his/her employment with SIG, it is necessary for SIG to entrust Employee with certain valuable proprietary information and knowledge of certain modes of business operation ("<u>Confidential Information</u>") which are essential to the profitable operation of SIG and which give SIG a competitive advantage over other firms pursuing related business activities. In the context of this Agreement, "<u>Confidential Information</u>" shall include all information, whether oral or written, which is indicated to be confidential by SIG when it is disclosed to the Employee or, even if not so indicated, information, whether oral or written, respecting SIG's business including, but not limited to, its trading and/or order execution techniques, methods and/or strategies; computer programs, software and data; computational algorithms, procedures, methods and/or techniques; training procedures; clearing operations; business plans and ideas; marketing techniques or strategies; products and product lines; pricing policies; trade secrets; cost information; commercial relationships; customer names, contacts and characteristics; financial results and projections (including, without limitation, the profitability of SIG's products and product lines); research and development activities and results; the identity, compensation and/or profitability of SIG's traders and/or any other information that could reasonably be expected to prove harmful to SIG if disclosed to third parties (including, but not limited to, any information that could reasonably be expected to aid a competitor of SIG vis a vis SIG). "<u>Confidential Information</u>" also includes all information as to which SIG owes an obligation of confidentiality to a third party (including, but not limited to, computer related vendors (hardware and software)). "<u>Confidential Information</u>" shall not include information which is, or shall become, public knowledge through no direct or indirect involvement on the part of the Employee or which is generally known in the industry. All Confidential Information which Employee may obtain or create on or subsequent to his/her beginning employment with SIG and prior to the end of Employee's employment hereunder (whether or not during the period of this Agreement) relating to the business of SIG shall not, without the prior written consent of SIG, be published, disclosed or made accessible by him/her to any other person, firm or corporation either during or after the termination of his/her employment, or used by him/her except while employed by SIG in the business and for the benefit of SIG. Employee shall be entitled to disclose Confidential Information if in the opinion of the Employee's legal counsel such disclosure is required to comply with any law, order, decree or governmental request, in which event the Employee shall promptly notify SIG of the disclosure requirement and, if requested, provide reasonable cooperation to SIG in obtaining a protective order or other confidential treatment to protect the confidentiality of the information to be disclosed.

Employee further agrees not to disclose to SIG any confidential or proprietary information belonging to any of the Employee's previous employers, or belonging to any other party, without first securing the written permission of such previous employer(s) or other parties.

Employee further agrees to refrain at all times after the date hereof from, directly or indirectly, making any oral or written statements of a disparaging, derogatory, defamatory, false or otherwise misrepresentative nature to any person or entity about or relating to SIG (including its related and affiliated companies) and each of their past, present and future directors, partners, officers, employees, attorneys, owners or agents. Nothing in this Agreement is intended to or shall be interpreted to restrict Employee's right and/or obligation to: (i) discuss working conditions with current SIG employees, (ii) testify truthfully in any forum and/or (iii) contact, cooperate with or provide information to any government agency or commission.

Employee further agrees not to disclose any of the terms of this Agreement to any person except: (i) to his/her outside advisors who need to know such information for the purpose of assisting him/her in the negotiation of this Agreement or with his/her financial affairs and (ii) subject to the restrictions set forth in Paragraph 7 hereof, to

his/her prospective or future employers or other persons for whom Employee may provide services who need to know such information for the purpose of determining that Employee's employment or provision of services will not violate any of the provisions of this Agreement (it being agreed that Employee will inform those advisors, prospective and future employers and other persons of the confidential nature of this Agreement and that Employee will prevent all such persons from disclosing the terms of this Agreement to any other individual or entity).

Nothing contained in this Agreement or in any other agreement between SIG and Employee shall be deemed to weaken or waive any rights related to the protection of trade secrets or confidential information that SIG may have under common law or any applicable statutes or rules.

12.     Ownership of Information. Any model, formula, algorithm, procedure, method, computer software, technique, strategy or other similar information that is not generally known in the securities industry and that is or was made known or furnished to or developed by Employee while in the employ of SIG shall be and remain the sole and exclusive property of SIG and shall not be utilized by Employee in any manner whatsoever after the termination of his/her employment. All right, title, and interest in and to any intellectual property, including without limitation any inventions (whether or not patentable), patents, trademarks, service marks, trade dress, trade names, trade secrets, copyrights, software, applications, creations and properties, made known or furnished to or developed by Employee in the course of rendering services to SIG, shall be and remain the sole and exclusive property of SIG and Employee and his/her successors and assigns shall have no interest of any kind therein or in or to any results or proceeds therefrom. Employee makes, and agrees to make, any assignment necessary to accomplish this Paragraph 12 and agrees to perform any act reasonably requested by SIG in furtherance of this assignment. Employee irrevocably designates SIG and its officers, agents and representatives as Employee's attorney-in-fact, with full power of substitution, to act for and on Employee's behalf to execute and file any document necessary or appropriate to accomplish such assignment, in each case, with the same effect as if executed, filed or performed by Employee. Employee hereby grants SIG permission in perpetuity to publish or reproduce in print, electronic, audio or video format his/her name, likeness, voice or image in any and all forms of media, whether now known or hereafter existing. Employee will make no claim (including any claim for compensation) against SIG and does hereby release any such claim in any way arising from or related to these materials, including but not limited to any claims with respect to copyright ownership, use, publication or reproduction of Employee's name, likeness, voice or image in any format or manner.

13.     Remedies.

(a)     Employee acknowledges that SIG would be irreparably harmed if Employee were to breach any of the terms of this Agreement and, therefore, agrees that SIG shall be entitled to injunctive relief (without the posting of any bond) to prevent any breaches or threatened breaches of this Agreement and to specific performance of its terms in addition to any other legal or equitable remedies. Nothing contained herein shall be construed as prohibiting SIG from pursuing any other remedies at law or in equity which it may have.

(b)     Employee agrees that quantification of the damages that would be suffered by SIG in the event of a breach by Employee of the restrictions contained in Paragraph 7(a) of this Agreement (a "Restriction Breach") would be impossible and that it is therefore appropriate for Employee and SIG to stipulate to liquidated damages that are to be recoverable by SIG in the event of a Restriction Breach. Accordingly, in the event of a Restriction Breach, Employee agrees to pay as liquidated damages to SIG the amount of any remuneration or compensation or other benefit (in any form, including without limitation, as cash, equity, phantom equity, return on equity or otherwise) received or earned by Employee from the provision of any services or activities performed by

Employee during the period of the Restriction Breach whether or not such remuneration or compensation was actually received by Employee during, before or after the period of the Restriction Breach. For all purposes of this Paragraph 13(b), Employee shall cooperate with SIG and make available to SIG all information, records and data as may be reasonably requested by SIG to determine and verify the amount of such remuneration or compensation. Notwithstanding anything herein to the contrary, SIG's ability to pursue injunctive relief shall be unaffected by its right to obtain liquidated damages pursuant to this Paragraph 13(b), it being the intention of the parties that SIG be able to recover liquidated damages for the period of the breach and injunctive relief to end a continuing breach (appropriately tolled as provided in Paragraph 10).

14.     Survival. The obligations of the Employee under the last sentence of Paragraph 3 and under Paragraphs 5(e), 5(f), 5(h), and 6 through 21, and SIG's right to enforce such obligations, shall survive the termination for any reason of Employee's employment with SIG.

15.     Severability; Modification by Court. If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of this Agreement which shall continue to be given full force and effect. If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be unenforceable because of the duration thereof, the geographical area included therein or the scope of the prohibited work or activity, the parties hereby expressly agree that the court making such determination shall have the power to reduce the duration and/or restrict the geographic area of such term, provision or paragraph and/or reduce the scope of prohibited work or activity and/or delete such specific words or phrases which the court shall deem necessary to permit enforcement of such term, provision or paragraph in restricted form. Should any court of competent jurisdiction find any term, provision or paragraph of any comparable agreement with any other current or former SIG employee invalid or unenforceable, or enforceable only in restricted form, then any such finding shall apply only to the current or former employee(s) involved as the party(ies) in that court proceeding, and shall not serve to alter or amend this Agreement or any other agreement between SIG and any other individual.

16.     Third-Party Beneficiaries; Successors. Each and every related and/or affiliated entity of Susquehanna International Group, LLP shall be, and is hereby, named and identified as an express and intended third-party beneficiary of this Agreement with full legal and equitable rights as such. This Agreement shall not be assigned by Employee or by SIG except that SIG may assign this Agreement (a) to any related and/or affiliated entity and/or (b) in the event of a change in control or sale of SIG in which case this Agreement shall inure to the benefit of SIG's successors and assigns.

17.     Governing Law and Forum. This Agreement and questions relating to its validity, interpretation, performance and enforcement shall be governed and construed according to the laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles. Employee and SIG submit to the exclusive jurisdiction of the state courts located in Montgomery County, Pennsylvania and to the Federal courts located in Philadelphia, Pennsylvania as to all actions and proceedings relating in any way to this Agreement, Employee's employment or its termination that are not determined by arbitration as provided in Paragraph 18 below. Employee and SIG further agree that such courts shall have personal jurisdiction over each of them and are a proper venue and a convenient forum with respect to all such actions or proceedings.

18.     Arbitration.

(a)     SIG and Employee agree that arbitration is a time and cost effective method to resolve disputes. All disputes, claims, or controversies arising out of or in connection with this Agreement, the Garden Leave

Agreement that Employee signed in favor of SIG (the "Garden Leave Agreement"), Employee's employment or its termination, including but not limited to those concerning workplace discrimination, sexual harassment and all other statutory claims shall exclusively be submitted to and determined by final and binding arbitration in Philadelphia, Pennsylvania, before an arbitrator or arbitrators ("Arbitrator") of the Financial Industry Regulatory Authority or its successors ("FINRA") in accordance with FINRA's then current rules for the resolution of employment disputes (the "Rules"), except as otherwise provided in subparagraphs (b) or (i) of this Paragraph 18. The number of Arbitrators to hear any claim shall be determined in accordance with the Rules. A copy of the Rules can be obtained from SIG's Human Resources Department or from FINRA's web site at www.finra.org.

(b) Employee understands that by entering into this Agreement, Employee is waiving the right to have a court and a jury determine Employee's rights, including under federal, state and local statutes prohibiting employment discrimination and sexual harassment. The requirement to arbitrate does not apply to the filing of an employment related claim, dispute or controversy with a federal, state or local administrative agency. The requirement to arbitrate also does not apply to any action by SIG with respect to any of Paragraphs 7 through 13 of this Agreement and/or Paragraph 1 of the Garden Leave Agreement, in which injunctive relief is sought.

(c) The Arbitrator shall not conduct class arbitration; that is, the Arbitrator shall not allow Employee to serve as a representative, as a private attorney general or in any other representative capacity. Employee understands that by entering into this Agreement, Employee is waiving the right (a) to serve as a representative, as a private attorney general or in any other representative capacity and (b) to participate as a member of a class of claimants, in any lawsuit filed against SIG (including its related and affiliated companies).

(d) Employee and SIG agree that all information disclosed during discovery or at the hearing and the decision of the Arbitrator shall be treated as confidential and shall not be disclosed by Employee to anyone other than to Employee's immediate family members, attorneys and tax advisors, and by SIG to anyone other than to SIG's attorneys, tax advisors and employees with a business reason to know said information, except to the extent otherwise required by law or ordered by the Arbitrator for "good cause" in the Arbitrator's sole discretion.

(e) The Arbitrator, in cooperation with the parties, shall set the date, time and place of the hearing.

(f) The Arbitrator shall have all of the power of a court of law and equity, including the power to order discovery as set forth in the Rules, and to grant legal and equitable remedies. Employee and SIG shall be entitled to one to three depositions per side, plus additional discovery as ordered by the Arbitrator upon a showing of need.

(g) The decision of the Arbitrator shall be in writing and set forth the findings and conclusions upon which the decision is based. The decision of the Arbitrator shall be final and binding and may be enforced under the terms of the Federal Arbitration Act (9 U.S.C. Section 1 et seq.), but may be set aside or modified by a reviewing court in the event of a material error of law. Judgment upon the award may be entered, confirmed and enforced in any federal or state court of competent jurisdiction.

(h) SIG and the Employee shall bear their respective filing fees. However, if Employee is unable as the result of demonstrated financial hardship to pay the filing fee, the filing fee in excess of $100 shall be paid by SIG. SIG and Employee shall each pay one-half of the Arbitrator's fees, except that if Employee is unable as a result of demonstrated financial hardship to pay said fees, all of the fees shall be borne by SIG. If the Employee claims an inability to pay said filing fees or Arbitrator's fees, Employee shall notify SIG's General Counsel in writing and provide reasonable evidence supporting said claim. If the parties are unable to reach agreement as to payment of the filing

fees or the Arbitrator's fees, the Arbitrator shall determine whether as a result of Employee's demonstrated financial hardship, SIG should pay them. The decision, in the Arbitrator's discretion or as required by law, may award to the prevailing party some or all of its attorneys' fees and costs, including filing and Arbitrator's fees.

(i) If Employee is required by the applicable rules of a securities exchange to arbitrate Employee's disputes, claims, or controversies pursuant to rules other than those of FINRA, the arbitration shall be conducted pursuant to the applicable rules and the terms of this Paragraph 18, to the extent that they are enforceable under the applicable rules. Moreover, in an arbitration in which the Rules apply, if any provision of this Paragraph 18 is not enforceable pursuant to the Rules, then said provision shall not apply.

(j) The obligations with respect to arbitration pursuant to this Paragraph 18 supersede any provisions governing arbitration in any other agreement executed by Employee, including a Form U-4.

19. Compliance with Law. Employee agrees to obey and comply with all laws and regulations to which Employee's activities are subject.

20. Waiver of Breach; Selective Enforcement. The waiver by SIG of Employee's breach of any provision(s) or covenant(s) of this Agreement shall not operate or be construed as a waiver of any subsequent breach by Employee of the same or different provision(s) or covenant(s). Selective enforcement of an agreement similar to this Agreement against some persons and not others (including the failure to impose a Garden Leave Period (as defined in a garden leave agreement) on another SIG employee) shall in no way be construed as affecting the enforceability of this Agreement with Employee, or be construed in any way against SIG.

21. Entire Agreement. This Agreement and the Garden Leave Agreement, which was executed by Employee as a condition of his/her employment, the terms of which are incorporated by reference herein and continue in full force and effect, contain the entire understanding among the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements of conditions, express or implied, oral or written except as herein contained. This Agreement may not be modified or amended, other than by an agreement in writing signed by the parties.

By: _____
Ted Bryce, Chief Operating Officer
For Susquehanna International Group, LLP

DATE: _____

Agreed and Accepted:

_____
Luis J. Cota
DATE: 9/24/2016

## EXHIBIT A

[To be completed by Employee]



# Relocation Financial Assistance Agreement

In consideration of Susquehanna International Group, LLP (collectively with its affiliated and related entities, "SIG"), agreeing to make certain payments in connection with my relocation, I hereby agree as follows:

I promise to pay SIG, on demand, an amount equal to the actual relocation financial assistance benefits ("Financial Assistance") which I receive in conjunction with my relocation if I voluntarily terminate my employment, if I am terminated for Cause (as defined in my employment agreement with SIG), or if I breach any of my obligations to SIG under my employment agreement with SIG), in each case, within 365 calendar days after I transfer to SIG's Bala Cynwyd office.

I hereby agree that SIG may deduct the Financial Assistance from any base compensation, bonus, vacation, expense reimbursements and other payments otherwise payable to me, to the extent permitted by applicable law. In addition, in the event that I fail to repay SIG, on demand, the Financial Assistance, I agree that SIG shall be entitled to recover its costs, including reasonable attorneys' fees, incurred to obtain repayment of the Financial Assistance.

I understand and agree that my consent to and execution of this Relocation Financial Assistance Agreement, shall not be construed as obligating SIG to continue my employment for 365 calendar days or any other period of time. I further understand and agree that I will provide any documentation required by SIG in connection with my Financial Assistance.

**Agreed and Acknowledged:**

Name: Luis Cota
Signature: /s/ Luis Cota
Date: 9/24/2016



401 City Avenue
Bala Cynwyd, PA 19004
www.sig.com

## GARDEN LEAVE AGREEMENT

In your position as an employee of Susquehanna International Group, LLP (together with its affiliated and related entities, "SIG"), you will have access to SIG Confidential Information (as defined below) and trade secrets, including, without limitation, SIG's trading strategies and methodologies, the levels of profitability of SIG's various trading activities and SIG's trading systems and tools. Moreover, your access to SIG Confidential Information and trade secrets is likely to continue to occur whether you remain in your initial position with SIG or if you are transferred to a different SIG business unit or trading area. In order to protect its Confidential Information and goodwill, SIG requires you, as a condition to your employment by SIG and to allowing you to access its Confidential Information, and trade secrets and to be potentially transferred to other SIG business units and/or trading areas, to enter into this Garden Leave Agreement (the "Agreement"). Consequently, you agree as follows:

1.  Garden Leave Period Restrictions. If your employment with SIG terminates for any reason, SIG may elect, by providing you written notice of such election by the tenth (10th) business day after the date your employment terminates (the "Termination Date"), to impose a "Garden Leave Period" that will begin on the Termination Date and last not less than three (3) months or more than one (1) year (the "Garden Leave Period"). During the Garden Leave Period, you shall not engage in or financially support, in any manner or capacity, any activity (a) involving or related to or supporting the trading (or brokering) of securities, commodities or any other financial products or (b) which is the same as, reasonably similar to or competitive with the activities that you either performed for SIG or involve or support trading strategies you gained knowledge of while at SIG. The length of the Garden Leave Period under this Paragraph 1 shall not run during any period that you are in violation of any of the terms of this Agreement, or any other agreement you now or hereafter have with SIG, including your employment agreement with SIG of even date herewith (the "Employment Agreement") and shall be extended for the period of any such violation.

2.  Payments during the Garden Leave Period. So long as (i) you have not breached (or, upon request by SIG, failed to provide assurances reasonable to SIG that you will not breach) any of your obligations to SIG under this Agreement or any other agreement you now or hereafter have with SIG, and (ii) the scope of the restriction in the Garden Leave Period remains in full force and effect and unaltered by any court or other tribunal, SIG shall pay you (a) during the portion of the Garden Leave Period that you are not otherwise subject to a general obligation under a SIG employment agreement not to trade securities (the "Garden Leave Payment Period"), a fee at an annual rate equal to one hundred percent (100%) of your base compensation on the Termination Date and (b) within thirty (30) days after the end of the Garden Leave Period, an amount equal to your target bonus, as set forth in writing and acknowledged by SIG, for the calendar year in which the Termination Date occurred multiplied by a fraction, the numerator of which is the number of days in the Garden Leave Payment Period and the denominator of which is 365 or 366 (if applicable, during a leap year). All payments made by SIG pursuant to this paragraph shall be paid consistent with SIG's normal payroll policies as in effect from time to time and shall be net of any applicable withholding requirements.

> *Illustration*: You resign your employment with SIG on October 31, 2017 and have a general obligation to SIG not to trade securities until January 1, 2018. Until November 14, 2017, SIG has the option to set a Garden Leave Period of not less than three (3) months or more than twelve (12) months from the Termination Date. In the event SIG elects to set an eleven (11) month Garden Leave Period, SIG will pay you (a) on a semi-monthly basis at a rate equal to 100% of your base compensation as of your Termination Date from January 1, 2018 until September 30, 2018 and (b) by October 30, 2018, your target bonus for 2017 multiplied by 273/365.

3.  Governing Law; Enforcement.

    (a)  You agree that this Agreement and questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed according to the laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles. All disputes, claims, or controversies arising out of or in connection with this Agreement shall be adjudicated as provided in the Employment Agreement; provided, however, that the requirement to arbitrate does not apply to any action for injunctive relief by SIG to enforce its rights under this Agreement.

    (b)  If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of this Agreement, which shall continue to be given full force and effect. If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be unenforceable because of the duration thereof, the geographical area included therein or the scope of the prohibited work or activity,

the parties hereby expressly agree that the court making such determination shall have the power to reduce the duration and/or restrict the geographic area of such term, provision or paragraph and/or reduce the scope of prohibited work or activity and/or delete such specific words or phrases which the court shall deem necessary to permit enforcement of such term, provision or paragraph in restricted form. Should any court of competent jurisdiction find any term, provision or paragraph of any comparable agreement with any other current or former SIG employee invalid or unenforceable, or enforceable only in restricted form, then any such finding shall apply only to the current or former employee(s) involved as the party(ies) in that court proceeding, and shall not serve to alter or amend any agreement between SIG and any other individual.

(c) You agree that quantification of the damages that would be suffered by SIG in the event of a breach by you of the restrictions contained in Paragraph 1 of this Agreement (a "Restriction Breach") would be impossible and that it is therefore appropriate for you and SIG to stipulate to liquidated damages that are to be recoverable by SIG in the event of a Restriction Breach. Accordingly, in the event of a Restriction Breach, you agree to pay as liquidated damages to SIG the amount of (a) any remuneration or compensation or other benefit (in any form, including without limitation, as cash, equity, phantom equity, return on equity or otherwise) received or earned by you from the provision of any services or activities performed by you during the Garden Leave Period that constitute or are related to a Restriction Breach, whether or not such remuneration or compensation was actually received by you during, before or after the Garden Leave Period and (b) any payments made to you by SIG pursuant to the terms of Paragraph 2 of this Agreement. For all purposes of this Paragraph 3(c), you shall cooperate with SIG and make available to SIG all information, records and data as may be reasonably requested by SIG to determine and verify the amount of such remuneration or compensation. Notwithstanding anything herein to the contrary, SIG's ability to pursue injunctive relief shall be unaffected by its right to obtain liquidated damages pursuant to this Paragraph 3(c), it being the intention of the parties that SIG be able to recover liquidated damages for the period of the breach and injunctive relief to end a continuing breach (appropriately tolled as provided in Paragraph 1).

4. Amendments and Waivers. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by you and SIG, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No waiver or amendment of, or failure by SIG to exercise any of its rights (including a failure to impose a Garden Leave Period) under, the terms of any comparable agreement with any other current or former SIG employee shall alter, amend or affect SIG's ability to enforce any of the terms of this Agreement (including SIG's right to impose a Garden Leave Period upon you).

5. Other Agreements. Whether or not SIG elects to impose a Garden Leave Period, you acknowledge and agree that certain provisions of your Employment Agreement (including without limitation, the non-disclosure, non-interference and arbitration provisions) remain in full force and effect and survive any termination of your employment with SIG. As used in this Agreement, "Confidential Information" has the meaning set forth in the Employment Agreement.

6. Condition of Employment. You understand and agree that the execution of this Agreement is a condition to your employment with SIG and that SIG would not retain you as an employee without your signing this Agreement.

Agreed and Acknowledged and
Intending to be Legally Bound:

_____        Susquehanna International Group, LLP
Luis J. Cota                              By: _____
                                              Ted Bryce, Chief Operating Officer

Date: 9/24/2016                           Date: _____